Brandon TAYLOR, Appellant,

v.

The STATE of Texas, Appellee.

No. 07–00–0219–CR.

Court of Appeals of Texas, Amarillo.

Feb. 27, 2001.

Michael H. Hummell, Corpus Christi, for appellant.

David M. Green, District Attorney, Dumas, for appellee.

Before BOYD C.J., and QUINN and JOHNSON, J.J.

QUINN, Justice.

Brandon Taylor (Taylor) appeals from a judgment under which he was convicted of possessing child pornography. His three issues concern the validity of the warrant authorizing the search of his home. The warrant was allegedly defective because the affidavit tendered in support of the application 1) lacked sufficient allegation to establish probable cause to believe that the evidence sought would be at the locale searched, 2) contained stale information, and 3) consisted of "conclusions that had no factual support". We address only the first issue for it is dispositive, and, upon addressing it, we reverse.

### Background

The locale sought to be searched was the residence of Taylor. Furthermore, the affidavit issued in support of the application for a warrant to search the locale was executed by Jay Foster, a Texas Ranger. Therein, he accused Taylor of possessing and concealing at the residence "material containing a visual image depicting . . . a child who was younger than 18 years of age . . . engaging in sexual conduct in violation of Texas Penal Code Section 43.26." This accusation was developed after receipt of correspondence from an Officer Michael A. DiMatteo of the San Bernardino County Sheriff's Department. According to documentation from DiMatteo and attached to Foster's affidavit, DiMatteo allegedly entered a chat room maintained by "America on Line" (AOL). A topic of ongoing discussion in the chat room was "sexual activity involving children". Fur-

thermore, the officer discovered that the participants "were using a computer program entitled 'Listmaker.exe,'" which purportedly allowed "a list to be compiled of persons in the specific chat room." AOL subscribers could allegedly place and remove their names from the list at will. Thereafter, the list could be transmitted through email to every AOL subscriber on the list. With it, "AOL subscribers with the same or similar interests" could then contact each other, according to DiMatteo. Allegedly, DiMatteo placed his name on the list and soon began receiving email containing photographic file attachments from AOL subscribers. These photographs depicted both adult and child pornography.

DiMatteo further alleged in his report that AOL maintained "records of persons using their service, including the name, address, telephone numbers, and other identifying information of subscribers." So too did he state that he obtained a search warrant permitting him to discover from AOL "subscriber information" applicable to those who allegedly sent the pornography. Elsewhere in his report, the statement was made that someone using the screen name "MENU441@aol.com" purportedly "contacted detectives from the San Bernardino County Sheriff's Department and transmitted child pornography and/or child erotica images via the internet. . . ." Furthermore, this incident occurred sometime between January 28, 1999 and March 8, 1999. The exact date was not specified in DiMatteo's report. Nor did he specify 1) the number of images purportedly sent by "MENU441@aol.com", 2) to whom the screen name was assigned, 3) whether the image was sent to DiMatteo or someone else in the Sheriff's Department, 4) whether the screen name "MENU441" appeared

on the aforementioned list of people using the AOL chat room wherein child pornography was discussed, or 5) whether he had seen that particular screen name while interacting with others in chat rooms.

Nevertheless, DiMatteo contacted law enforcement officials in Moore County and informed them about "a criminal investigation in which a person residing within [that] jurisdiction has transmitted child pornography or child erotica to [him] via the internet." So too did DiMatteo offer to forward an "electronic copy of this data" to them if they sent to him a "self addressed stamped envelope and a 3 1/2 inch DOS computer diskette...." Foster responded to DiMatteo's missive and received a computer diskette on June 16, 1999. According to Foster, the diskette contained one photograph of two nude female children involved in sexual conduct.

Other representations in Foster's affidavit included the statement that DiMatteo had obtained an "Online Account Profile for the screen name MeNu441, that *comes back* to Brandon Taylor, HCR 3, Box 8, Dumas, Texas 79029 ... 806–935–5957." [1] (Emphasis added). So too did it include statements regarding 1) the need to seize from that address all computer related equipment to "completely and accurately retrieve data maintained in computer hardware or ... software", 2) his belief that a plethora of child pornography would be found in "computer storage facilities or other data storage facilities" and numerous other computer related items of equipment located at the residence, 3) his beliefs regarding the propensities of those engaged in the trading, collecting, sending or receiving child pornography, and 4) his conclusion that Taylor had "specialized knowledge of computer data and storage" which presented a "significant risk" that the "suspect" could "destroy" the information if "he [were] given any warning whatsoever of the execution of the Search Warrant." [2]

Based on the foregoing, a magistrate issued the search warrant on June 30, 1999, and a search of Taylor's residence at HCR 3, Box 8, Dumas, Texas ensued. There, computer equipment was discovered along with evidence of the crime for which Taylor was convicted. Furthermore, it was conceded by Foster that "all the physical evidence" used in the prosecu-

---

1. How Foster obtained the specific name, address, and phone number of Taylor so as to include it in his affidavit does not appear in the record before us. Foster simply stated that DiMatteo obtained the information but failed to state that DiMatteo or anyone else informed him of that. Furthermore, the reports and letter from DiMatteo (which Foster attached to his affidavit) omitted reference to the name and address of the individual utilizing screen name "MENU441". Nor did DiMatteo state in his letter or reports that 1) Taylor's name, address and phone number were obtained from AOL, 2) "MENU441" was a screen name appearing on the list of individuals participating in any AOL chat room wherein child pornography or pornography in general were discussed, or 3) "MENU441" appeared on any list created via the program entitled "Listmaker.exe".

2. On what basis the affiant concluded that Taylor had "specialized knowledge" in computers and computer storage devices appeared nowhere in the affidavit. Other than the conclusory statement that Taylor had such knowledge and the comment that a search of the screen name "MENU441" came back to Taylor, nothing in Foster's affidavit or the attachments thereto addressed Taylor's education, experience, training or background *viz* computers and related equipment. And, we are hard-pressed to conclude that simply because someone may have an account with AOL that person must have specialized knowledge in the way of computers. Indeed, nowhere in the affidavit or its attachments does anyone even state that Taylor owned a computer.

tion of Taylor was obtained "based on the search warrant".

### Standard of Review

Whether the trial court erred in denying a motion to suppress depends upon whether he abused his discretion. *Guzman v. State,* 955 S.W.2d 85, 87 (Tex. Crim.App.1997). Whether he abused his discretion depends upon whether the decision fell outside the zone of reasonable disagreement. *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex.Crim.App.1991). Furthermore, in making that determination, we defer to the trial court's resolution of historical fact. *Guzman v. State,* 955 S.W.2d at 89. Yet, the same is not true about the trial court's interpretation of law or application of law to fact. As to the latter, no deference is required for we review those matters *de novo. Id.; Wachter v. State,* 961 S.W.2d 598, 600 (Tex.App.—San Antonio 1997, pet. ref'd.).

Next, it is beyond dispute that a search warrant may not be issued unless sufficient facts are presented to a magistrate which permit him to conclude that probable cause exists supporting the warrant's issuance. TEX.CODE CRIM. PROC. ANN. art. 18.01(b) (Vernon Supp.2000). Furthermore, these facts must be contained in a "sworn affidavit" accompanying the application for the warrant, *id.,* and illustrate 1) that a specific offense was committed, 2) that the specifically described property or items to be sought and seized constitute evidence of that offense or evidence that a particular person committed the offense, and 3) that the property or items in question are located at or on the particular person, place or thing to be searched. *Id.* at art. 18.01(c). Whether the facts mentioned in an affidavit are adequate to establish probable cause depends on the totality of the circumstances. *Ramos v. State,* 934 S.W.2d 358, 362–63 (Tex.Crim.

App.1996), *cert. denied,* 520 U.S. 1198, 117 S.Ct. 1556, 137 L.Ed.2d 704 (1997). And, the facts do so when the circumstances justify a conclusion that the object of the search is *probably* on the premises. *Id.* at 363. In other words, the magistrate must have before him sufficient facts upon which to conclude that "there is a fair probability that contraband or evidence of a crime will be found in a particular place". *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). And, it is our duty to insure that the magistrate had a " 'substantial basis' " for so concluding. *Id.* at 238–39, 462 U.S. 213, 103 S.Ct. at 2332, 76 L.Ed.2d 527. Finally, in reaching his decision, the magistrate may draw reasonable inferences from fact and circumstances alleged in the affidavit before him. *Ramos v. State,* 934 S.W.2d at 363.

### Application of Standard

*1. Probable Cause to Search the Residence*

Taylor's first issue concerns whether Foster's affidavit and the attachments thereto contained facts lawfully enabling a magistrate to conclude that child pornography was probably located at HCR 3, Box 8, Dumas, Texas. We conclude that it does not.

Notable is what the affidavit and attachments presented to the magistrate do not reveal. They say nothing about 1) the operations or mechanics of AOL or whether anyone can have access to AOL and its services, 2) how items, files or images are sent over AOL, 3) how one is assigned a screen name by AOL, 4) whether one or more people subscribing to AOL can have the same screen name, 5) whether people other than to whom the screen name is assigned can use or access the screen name, 6) whether the statement that the search of AOL subscriber information for the screen name in question "comes back

to Brandon Taylor" meant that Taylor was assigned the screen name "MENU441" or was one of many capable of using that moniker, 7) whether those subscribing to AOL can access the internet service provider only at a particular geographic locale, 8) whether the geographic address provided to AOL by someone using its internet services was the only address at which the internet service could be accessed, 9) whether the geographic address provided AOL was the address from which the individual using "MENU441" sent the internet transmission in question, 10) whether Taylor maintained a computer or other electronic equipment that could access the internet at HCR 3, Box 8, Dumas, Texas, 11) whether there were other pornographic images sent anywhere by "MENU441", 12) how many images one must send to be classified as someone trading, collecting or being involved in the sending or receiving of child pornography and, therefore, be labeled as having the propensities of someone in that trade or genre, 13) the background of Taylor and his history, if any, of engaging in conduct like that charged in the affidavit, 14) when DiMatteo served AOL with the search warrant seeking subscriber information pertaining to "MENU441", 15) whether the search warrant was limited to determining the identity of those using the screen name "MENU441" at the time the image in question was received by the San Bernardino Sheriff's Department or whether it encompassed all time periods in which anyone could have had the screen name, 16) whether Taylor utilized the screen name "MENU441" on the date the picture from "MENU441" was received in San Bernardino, or 17) whether Taylor was the only one to have used "MENU441" over AOL's system.

Instead, the documentation tendered in support of the warrant discloses 1) one instance of one image being sent within a three month time frame from somewhere over the internet to someone in the San Bernardino Sheriff's Department by someone using the screen name "MENU441", 2) a general description of the propensities of someone "involved" in, trading and collecting child pornography, and 3) the representation that the screen name "MENU441" somehow "comes back to Brandon Taylor, HCR 3, Box 8, Dumas, Texas". And, we ask if this and any reasonable inferences therefrom are enough to support the conclusion that computer equipment containing "graphic computer images depicting the sexual performance/sexual conduct of children less than 18 years of age" would be found at HCR 3, Box 8, Dumas, Texas. A similar question was posed to the panels in *United States v. Hay*, 231 F.3d 630 (9th Cir.2000) and *United States v. Grant*, 218 F.3d 72 (1st.Cir.2000), *cert. denied*, 531 U.S. 1025, 121 S.Ct. 596, 148 L.Ed.2d 509 (2000) and each found the existence of probable cause.

However, the magistrates in those cases had information lacking at bar. For instance, they were told that the suspect maintained a computer or computer related equipment at the place to be searched, which equipment was capable of transmitting child pornography of the type transmitted. *E.g., United States v. Hay*, 231 F.3d at 632; *United States v. Grant*, 218 F.3d at 74. Or, they had before them information disclosing that one using the screen name being utilized needed a particular password, which password tended to render the screen name beyond use by the general public. *E.g., United States v. Grant*, 218 F.3d at 75. Or, the magistrate was told that the transmission of child pornography was to a unique internet or ethernet address assigned to a particular computer or computer related equipment *at the location to be searched. E.g., United States v. Hay*, 231 F.3d at 632. Or, the

affidavit tendered the magistrate contained facts revealing that the person occupying the locale to be searched had an "extreme" interest in young children, *e.g.*, *United States v. Hay*, 231 F.3d at 634, or had access to internet sites operated by entities which obligated those having access to maintain large quantities of internet accessible child pornography. *E.g.*, *United States v. Grant*, 218 F.3d at 76.

This latter indicia was deemed important because it enabled the magistrate to 1) rely on general information given him about the propensities of pedophiles and 2) infer that the particular suspect had the same propensities because of the particular suspect's "extreme" interest in children or ownership of numerous items of child pornography. *E.g., United States v. Lacy*, 119 F.3d 742, 746 n. 6 (9th Cir.1997), *cert. denied*, 523 U.S. 1101, 118 S.Ct. 1571, 140 L.Ed.2d 804 (1998). Moreover, the specific characteristics deemed relevant consisted of a pedophile's propensity to collect child pornography and maintain the collection at his home. This, in turn, provided basis to reasonably infer that contraband could probably be found in the respective suspect's home.[3] *Id.*

In short, the data before the respective magistrate in *Hay, Lacy,* and *Grant* included facts illustrating that the contraband was susceptible to receipt or delivery over the internet from the specific site to be searched. We have no such data at bar. Admittedly, a search of AOL records indicated that "MENU441" somehow "comes back to" Taylor who lived at a specified address. Yet, that Taylor utilized or had assigned to him the screen name *when the transmission was sent,*

that he owned or otherwise maintained a computer or computer related equipment at the locale, that he had the capability of accessing AOL from the address, that the transmissions came from a particular computer or internet related equipment at HCR 3, Box 8, Dumas, Texas, or that others could not use the screen name appeared nowhere in Foster's affidavit or its attachments. Furthermore, we do not think it reasonable to infer the presence of those indicia simply because a search of AOL records 1) attributed the screen name to Taylor at one time or another and 2) contained the address eventually searched.

Nor can we infer that Taylor had the propensities of a pedophile or individual trafficking in such smut. Again, the record before us reveals only one image being sent by someone using the screen name "MENU441". Data supporting the conclusion that the transmission of one image with nothing more qualifies one as a pedophile, or as someone with an unusual interest in children, or as someone otherwise "involved" in the trafficking of child pornography appeared nowhere in the record before the magistrate. Nor have we found any case so holding. Similarly absent from the affidavit or attachments is evidence that Taylor collected child pornography or had an interest in same, assuming that he even sent the one image to San Bernardino. Thus, the teachings of *United States v. Weber* would compellingly urge against a magistrate reasonably 1) attributing to him the propensities of a pedophile or like individual and, therefore, 2) inferring that, like a pedophile, Taylor would maintain pornography at his residence.

---

**3.** Conversely, if the affidavit failed to explain the extent of the suspect's involvement with child pornography, it was held that the characteristics of a pedophile or person involved in child pornography could not be attributed to the individual. *United States v. Weber*, 923 F.2d 1338, 1345 (9th Cir.1990). And, thus, the aforementioned propensities could not be used to infer a link between the place to be searched and the presence of contraband. *Id.*

In sum, we are not ready to conclude that a fair probability of finding child pornography at Taylor's home arose from the facts that governmental authorities 1) received contraband sent from somewhere by someone using an alias, 2) obtained information that Taylor used the alias at some time or another, and 3) knew where Taylor lived. And, when the totality of the circumstances before us are considered, those facts are actually the only relevant ones appearing in Foster's affidavit. More is needed before the sanctity of one's home can be invaded by the government; it is not enough to simply conclude that contraband is in one's home merely because the suspect has a home. Thus, the warrant in question was fatally defective. In failing to so hold and suppress the evidence obtained during the ensuing search, the trial court erred. And, because the record discloses that all the evidence used to convict Taylor was obtained via execution of the defective warrant, the error was harmful.

Accordingly, we reverse the judgment and remand the cause for further proceedings.